IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS, an Oregon          Case No. 6:12-cv-01739-AA
non-profit corporation; THE                 OPINION AND ORDER
CENTER FOR BIOLOGICAL
DIVERSITY, an Arizona non-
profit corporation; and BENTON
FOREST COALITION, an Oregon
corporation,

        ·Plaintiffs,

    v.

BUREAU OF LAND MANAGEMENT, an
administrative agency of the
United States Department of
Interior,

        Defendant,

    v.

SENECA SAWMILL CO., an Oregon
corporation,

        Defendant-
        Intervenor.

_____

Nicholas S. Cady
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440

Daniel C. Snyder
Charles M. Tebbutt
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence Street
Eugene, Oregon 97401
    Attorneys for plaintiffs

Page 1 - OPINION AND ORDER

Robert G. Dreher
Acting Assistant Attorney General
Jared S. Pettinato
Trial Attorney
United States Department of Justice
Environmental and Natural Resources Division
P.O. Box 663
P.O. Box 7611
Washington, District of Columbia 20044

S. Amanda Marshall
United States Attorney
Sean E. Martin
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
    Attorneys for defendant

Scott W. Horngren
American Forest Resource Council
5100 S.W. Macadam, Suite 350
Portland, Oregon 97239
    Attorney for defendant-intervenor

AIKEN, Chief Judge:

Plaintiffs Cascadia Wildlands, the Center for Biological Diversity, and the Benton Forest Coalition move for summary judgment pursuant to Fed. R. Civ. P. 56. Defendant the Bureau of Land Management ("BLM") and defendant-intervenor Seneca Sawmill Co. ("Seneca") each filed cross-motions for summary judgment. For the reasons set forth below, the plaintiffs' motion is denied and the BLM's and Seneca's motions are granted. This case is dismissed.

## BACKGROUND

This case involves a challenge to the BLM's authorization of the Rickard Creek timber sale ("Project"). The Project site is located within the Marys River Watershed, which spans approximately 193,962 acres. Administrative Record ("AR") 648, 675, 677. The Project area encompasses 111 acres, 92 of which are slated for

Page 2 - OPINION AND ORDER

regeneration harvest, in the Matrix and Riparian Reserves land use allocations as defined under the 1995 Salem District Resource Management Plan ("Salem RMP"); the Project was designed to ensure that the landscape contained forest habitat in the early stages of development to "support [a] high diversity of wildlife species," as the existing stand was overly dense with "slowing growth and declining health and vigor." AR 328-29; see also AR 647, 675, 16752-53. The regeneration harvest would leave between nine and eleven live trees per acre, for approximately 900 total leave trees. AR 675, 1595-1604 (inventorying the leave trees).

In 2004, the BLM initiated planning for the Rickard Creek timber sale. In order to analyze the potential environmental impacts of the Project, the BLM conducted an environmental assessment ("EA"), which was released for public comment in 2008; the first Decision Rationale was published in May 2009. AR 1163 (2009 Decision Rationale), 1441 (2008 EA). The BLM released a revised EA in 2009 to address issues raised in protest to the 2009 Decision Record. See AR 675, 1000 (2009 EA).

In October 2011, the Fish and Wildlife Service ("FWS") issued a "12-Month finding on a Petition to List a Distinct Population Segment of the Red Tree Vole as Endangered or Threatened." AR 7757-99; see also 76 Fed. Reg. 63720 (Oct. 13, 2011). The study's conclusions primarily relate to a Distinct Population Segment ("DPS") of red tree vole that inhabits area in the Northern Coast range, the majority of which is concentrated north of Highway 20. AR 7767 (map of the North Oregon Coast DPS). Within the DPS,

however, the FWS identified two clusters of Federal land that constituted "most of the remaining high-quality habitat for red tree voles," the majority of which lies "south of U.S. Highway 20," which includes the Marys River and Upper Alsea Watersheds, and the other "lying north of Highway 20, mainly between Lincoln City and Tillamook." AR 7786; see also AR 7767. The study found that "[a]ll sites on Federal land within the DPS are considered high-priorty sites with the exception of the 198,000 ac (80.130 ha) of the southernmost portion of the DPS." AR 7783; see also AR 7786 ("every site is critical for persistence for the red tree vole in Oregon's North Coast Range north of Highway 20"). The FWS concluded that listing the North Oregon Coast DPS under the Endangered Species Act ("ESA") was warranted but precluded by higher priority actions. AR 7790-99. As a result, the red tree vole was added to the FWS' Candidate Species List. Id.

In February 2012, the BLM released another revised EA; the BLM also issued a separate analysis document, the "Proposal for Non-High Priority Site Status for Red Tree Voles in the Rickard Creek Project Area (the Red Tree Vole Analysis)," which designates the Marys River Watershed as a non-high priority site under the Northwest Forest Plan ("NFP"). AR 319 (2012 EA), 561-72, 675-84 (most recent Red Tree Vole Analysis), 14695. The 2012 EA, which includes and expands upon information from the prior EAs and incorporates by reference the Red Tree Vole Analysis, approved the Rickard Creek timber sale and confirmed that it complied with the applicable land-use plans. AR 319-434. Pursuant to that decision,

the BLM acknowledged that the proposed action authorized removal of trees occupied by red tree voles,[1] but nonetheless found that the Project could proceed because it was not a high-priority site for the vole and, further, would not contribute to the need to list that species under ESA.  Id.

The Forest Service and the FWS concurred with the BLM's non-high priority site designation. AR 2172, 2169.  In so concurring, the FWS clarified that the language "used in the 12-month finding is in no way meant to change or override the FS and BLMs process for identifying [non-high priority] sites within the DPS."  AR 2020-21, 2056.  The FWS explained further that, within the DPS but south of Highway 20, "voles are more common and more widely distributed and habitat is more available than further north."  AR 2169.

Thereafter, plaintiffs challenged the Project via administrative protest; the BLM responded to plaintiffs' protests and affirmed its decision to proceed with the proposed action.  On September 26, 2012, plaintiffs filed a complaint in this Court, alleging that the BLM violated the Federal Land Policy and Management Act ("FLPMA") by: (1) improperly classifying the Project

---

[1] "The red tree vole is a species of rodent and is one of the most arboreal mammals in the Pacific Northwest, living most of its life in the forest canopy . . . The species is closely associated with old-growth forest habitat; the red tree vole is also an important source of food for the northern spotted owl and other predators."  Cascadia Wildlands v. Bureau of Land Mgmt., 2012 WL 6738275, *1 n.2 (D.Or. Dec. 21, 2012).  Typically, red voles are hard to locate, patchy in their distribution, and occur in small populations; nonetheless, they occur over a relatively broad geographic range.  AR 676, 4436, 7758-59 (map of range).

area as non-high priority site; and (2) contributing toward the need to list the red tree vole under the ESA. In light of these alleged violations, plaintiffs request that the BLM be enjoined from proceeding with the Rickard Creek timber sale.

On May 4, 2013, this Court denied plaintiffs' motion to supplement the administrative record. On May 17, 2013, plaintiffs moved for summary judgment. On June 14, 2013, the BLM filed a cross-motion for summary judgment. On June 21, 2013, plaintiffs moved to strike one of the BLM's exhibits in support of its cross-motion. On June 24, 2013, Seneca filed a cross-motion for summary judgment.

**STANDARD**

A federal agency's compliance with the FLMPA is reviewed under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. In an APA case, summary judgment is awarded in favor of the plaintiff if, after reviewing the administrative record, the court determines that the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Natural Res. Def. Council v. Nat'l Marine Fisheries Serv., 421 F.3d 872, 877 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)). A decision is not arbitrary or capricious if the federal agency articulated a rational connection between the facts found and the choice made. Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 384 F.3d 1163, 1170 (9th Cir. 2004); Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), overruled on other grounds by Am. Trucking Ass'ns Inc. v. City of L.A., 559 F.3d 1046 (9th Cir. 2009)

(the court "will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

Review under this standard is narrow and the court may not substitute its judgment for that of the agency. Lands Council, 537 F.3d at 987. Nevertheless, while this standard is deferential, the court must "engage in a substantial inquiry, . . . a thorough, probing, in-depth review." Native Ecosys. Council v. U.S. Forest Serv., 418 F.3d 953, 960 (9th Cir. 2005) (citation and internal quotations omitted).

## DISCUSSION

Plaintiffs assert that designation of the Rickard Creek Project as non-high priority vole habitat was arbitrary and capricious because that site does not meet any of the requisite four criteria outlined in the NFP.[2]  In addition, plaintiffs assert that the proposed action is wrongful because it contributes to the

---

[2] To the extent that plaintiffs also assert that areas containing known voles sites are "categorically excluded from non-priority designation," their argument is rejected.  Pls.' Mem. in Supp. of Mot. Summ. J. 12.  Critically, the NFP makes clear that non-high priority designation can be made on a "case-by-case basis."  AR 2983, 13447, 14695.  Further, plaintiffs' contention is not supported by the record, which indicates that not every site within the proposed Project area or the DPS is critical for vole persistence.  Id. (citing  AR 4440-41, 7786); see also AR 2020-21, 2169.

need to list the red tree vole as endangered pursuant to the ESA.

The BLM contends, to the contrary, that its decision to authorize the Project due to its non-high priority site status was rationale and supported by the record. Moreover, while the BLM acknowledges that the Project will have some impact on individual voles, it argues that the proposed action does not threaten the species as a whole. Seneca joins the BLM's arguments regarding the FLMPA and further asserts that plaintiffs' claim fails because they lack standing and the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act ("O&C Act") precludes application of the NFP and/or FLMPA in this context.[3]

I.    <u>Standing</u>

Before reaching the merits of the parties' cross-motions for summary judgment, the Court must address whether plaintiffs have standing to bring this challenge under the FLPMA. <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 102 (1998) (standing is a threshold jurisdictional question). Article III of the Constitution grants federal courts authority to adjudicate legal disputes only where an actual case or controversy exists. <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 11 (2004). To enforce this limitation, litigants must demonstrate "a personal stake in the outcome of the controversy." <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 493 (2009) (citation and internal quotation

---

[3] Where Seneca's arguments in favor of summary judgment are analogous to those asserted by the BLM, the Court will address their motions together.

marks omitted).  Thus, the "irreducible constitutional minimum of standing" requires the party invoking the court's jurisdiction to demonstrate that: (1) he or she suffered an "injury in fact"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and 3) "it must be likely . . . that the injury will be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and internal quotations omitted).

Seneca argues that plaintiffs lack standing because "they have no legal right to access the Rickard Creek Project area, which the BLM must access using a limited right-of-way agreement that only allows access to remove timber and other forest products on a road crossing Starker Forests private land."  Def.-Intervenor's Mem. in Supp. of Cross-Mot. Summ. J. 2.  Seneca contends further that any other method used to access the Project area, including hiking, would entail illegal trespass: "[t]he section containing the project area is completely enclosed by private timberland [owned by Starker Forests Inc., Starker Properties L.L.C., or Hull Oakes Lumber Company] . . . Those companies do not allow the public to cross their land onto public lands."  Def.-Intervenor's Reply to Cross-Mot. Summ. J. 5 (citing Vomicil Decl. ¶ 8; Nystrom Decl. ¶ 4).

Conversely, plaintiffs' assert that, under Cal-Neva Land & Timber Inc. v. United States, 70 F. Supp. 2d 1151 (D. Or. 1999), they have standing because their "members are properly construed as licensees of the United States, as the easement does not define

Page 9 - OPINION AND ORDER

that term and conveys 'free use' of the road to the government [such that it] provides an inherent right of access to the public." Pls.' Reply to Mot. Summ. J. 2.    Additionally, while plaintiffs note briefly that the Project site is accessible by "lawfully hiking through public lands," they do not address Seneca's arguments.    Id. at 3.  As such, this case initially hinges on terms of the the right-of-way between Starker Forests and the United States.

    "The interpretation of an express easement, like that of contracts and other written instruments, is a question of law for the court."  Tri-Cnty. Metro. Transp. Dist. of Or. v. MCI Commc'ns Servs., Inc., 2010 WL 1335010, *4 (D. Or. Mar. 31, 2010) (citations and internal quotations omitted); see also Tipperman v. Tsiatsos, 327 Or. 539, 544-45, 964 P.2d 1015 (1998).  "In construing an easement, [the court's] fundamental task is to discern the nature and scope of the easement's purpose and to give effect to that purpose in a practical manner."  Tri-Cnty. Metro., 2010 WL 1335010 at *4 (citations and internal quotations omitted).  To ordain an easement's purpose, the court "look[s] first to the words of the easement, viewing them in the context of the entire document," and endows them with "their plain, ordinary meaning."  Id. (citations and internal quotations omitted).  If the plain language of the easement "clearly express[es] [its] purpose, the analysis ends." Id. (citations and internal quotations omitted).  "Ordinarily, an easement passes no rights to the grantee except those rights that are necessary for the easement's reasonable and proper enjoyment"

and the grantor retains "full dominion and use of the land [subject to an easement], except so far as a limitation of the grantor's right is essential to the fair enjoyment of the easement that was granted." Id. (citations and internal quotations omitted).

Here, easement between Starker and the BLM states, in relevant part:

> For the consideration of the granting of the right-of-way applied for on the above-mentioned date, the permittee [Starker] hereby grants:
>
> a. [t]o the United States, pursuant to 43 CFR 2234.2-3(b)(7)(i)(a), rights-of-way across the following-described lands for use by the United States, its licensees and permittees, for the following specified periods of time[;]
>
> b. [t]o the United States and its licensees rights-of-way (purchasers of United States timber), pursuant to 43 CFR 2234.2-3(b)(7)(i)(b), the rights to use the roads and rights-of-way owned and controlled by the permittee across the hereinafter described lands for the management and removal of timber and other forest products from the lands of the United States.

Vomicil Decl. Ex. 1, at 1. "Licensees" are therefore defined as persons authorized to remove forest or timber products from BLM land; however, the easement does not define the government's "permittees." Id.; see also 43 C.F.R. § 2234.2-3(b)(3)(x). In any event, unlike the easement at issue in Cal-Neva Land & Timber, the right-of-way between Starker and the United States neither bestows upon the BLM, its licensees and/or permittees, full use of nor control over the roadway. See Cal-Neva Land & Timber, 70 F. Supp. 2d at 1158-59. Rather, the limited right-of-way at issue "is not an easement for public use or access to BLM lands" but rather for exclusively for the management and removal of timber and other

Page 11 - OPINION AND ORDER

forest products.  Vomicil Decl. ¶ 3.

Moreover, Starker regulates public access on its roads and land through a permitting process for specified uses; it categorically will "not issue permits for someone to climb trees[,] particularly . . . to someone to climb trees to look for red tree voles on our property or to access BLM property to climb trees" due to potential liability issues. Id. at ¶¶ 6, 8.  The record demonstrates that the Project site is enclosed by private timber lands and, beyond merely concluding that the Rickard Creek area is accessible via public lands, plaintiffs have not identified any public or otherwise legal access point. Id.; see generally Nystrom Decl.; see also AR 146, 440, 828.  In any event, the companies who own these private lands do not allow the public to utilize their property to access the Project site. See Vomicil Decl. ¶ 8; Nystrom Decl. ¶ 4.

Accordingly, Seneca is likely correct that "a person seeking to enter the Rickard Creek site for the purpose of pursuing litigation or to study tree voles is trespassing." Def.-Intervenor's Reply to Cross-Mot. Summ. J. 5-6 (citing Leo Sheep Co. v. United States, 440 U.S. 668, 688 (1979); and Halperin v. Pitts, 241 Or. App. 249, 254, 250 P.3d 402 (2011), rev'd in part on other grounds, 352 Or. 482, 287 P.3d 1069 (2012)).  Further, plaintiffs neither state any present or future intent to obtain permits from Starker to access the Rickard Creek area for recreational use, nor do they allege the existence of any publicly accessible place from which they might observe tree voles or enjoy the trees or other

natural aspects of the natural landscape.  <u>See generally</u> Ferris Decl.; Schiff Decl.; Greeenwald Decl.; <u>see also</u> Am. Wilson Decl. ¶ 8 (indicating only that he obtained a permit once, several years ago, to collect firewood).  This is likely because voles are notoriously difficult to detect, especially from any sort of distance, and trees on the surrounding private lands obscure any clear line-of-sight between publicly accessible lands and the Project area.  <u>See generally</u> Pls.' Mem. in Supp. of Mot. Summ. J.; Pls.' Reply to Mot. Summ. J.; Pls.' Surreply to Mot. Summ. J.

The Court finds the issue of standing to be a close call and one that raises several concerns. On the one hand, finding that plaintiffs do not have standing would effectively allow the BLM to engage in potentially illegal conduct on lands inaccessible to the public without any public or judicial oversight.  On the other hand, due to the unique nature of both the vole and the Project site, determining that plaintiffs have standing could sanction trespassing.  Further, while "[a]n ability to use the adjacent [private] land is simply not a requisite for standing," plaintiffs neglected to provide any evidence of a legal or public access point from which they can observe and enjoy the Project site. <u>See</u> <u>Soda Mountain Wilderness Council v. Norton</u>, 424 F. Supp. 2d 1241, 1255-56 (E.D. Cal. 2006) (citing <u>Cantrell v. City of Long Beach</u>, 241 F.3d 674, 681 (9th Cir. 2001)).

Regardless, even if plaintiffs were allowed and able to submit such evidence, their FLPMA claims fail on the merits.  Accordingly, the Court presumes that jurisdiction exists and bases its summary

Page 13 - OPINION AND ORDER

judgment decision instead on the parties' substantive arguments regarding the FLMPA.

II. FLPMA Claims

The FLMPA establishes requirements for land use planning on public lands. See 43 U.S.C. §§ 1701-1785. Under the FLPMA, the BLM is required to "develop, maintain, and when appropriate, revise land use plans to ensure that land management be conducted on the basis of multiple use and sustained yield." Or. Natural Res. Council Fund v. Brong, 492 F.3d 1120, 1125 (9th Cir. 2007) (citations and internal quotations omitted). Once a land use plan is developed, "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a).

The land use plan governing the Rickard Creek Project is the NFP, as incorporated into the Salem RMP; it therefore "embodies the substantive management directives with which the BLM must comply under the FLPMA." Brong, 492 F.3d at 1125; see also AR 16492-18402. The BLM, however, retains "a great deal of discretion in deciding how to achieve" compliance with the applicable land use plan. Klamath Siskiyou Wildlands Ctr. v. Gerritsma, 2013 WL 4477834, *4 (D. Or. Aug. 21, 2013) (quoting Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004)).

Pursuant to the NFP, the BLM is required to manage any proposed action involving "matrix lands" for long-term timber production. See Soda Mountain Wilderness Council v. Bureau of Land Mgmt., 2013 WL 1975852, *10 (D. Or. May 10, 2013). Additionally,

the NFP establishes, in relevant part, the Survey and Manage Standards and Guidelines, which provide added environmental protections for rare and unique species such as the red tree vole, and includes the obligation to follow the applicable Management Recommendation. Id. In January 2001, the Survey and Manage Standards and Guidelines were modified; these changes are reflected in the 2001 Record of Decision ("2001 ROD"), which "remains in effect." Cascadia, 2012 WL 6738275 at *2 n.3; see also BLM's Mem. in Supp. of Cross-Mot. Summ. J. 13 n.1; AR 13524-683.

A.  Categorization of the Rickard Creek Project Area as a Non-High Priority Vole Site

Under the 2001 ROD, the red tree vole is classified as Category C species, which means that they are relatively uncommon but "not all known sites or population areas are likely to be necessary for reasonable assurance of [the species'] persistence. AR 13447, 13790; see also Klamath Siskiyou Wildlands Ctr. v. Boody, 468 F.3d 549, 556-60 (9th Cir. 2006). As such, the current Survey and Manage Standards and Guidelines compel federal agencies to conduct pre-disturbance surveys on high priority sites before engaging in ground-disturbing activities, such as lumbar harvests, within Category C species habitat; where the pre-disturbance survey indicates that red tree voles are present, the Management Recommendations generally require the agency to establish a minimum ten-acre habitat around active nest sites, wherein no logging can occur. AR 13513, 13790-91, 16623-24; see also Boody, 468 F.3d at 558.

Page 15 - OPINION AND ORDER

The 2001 ROD makes clear, however, that, in the absence of designated high priority areas, Category C species sites can either be managed as high priority or determined to be non-high priority on "case-by-case basis." AR 13477 ("[u]ntil Management Recommendation is written addressing high-priority sites either assume all sites are high priority or local determination and project NEPA documentation of non-high priority sites may be made on case-by-case basis"). The most recent Management Recommendations for red tree voles did not address high priority sites. High-priority sites have therefore not been designated within the Rickard Creek area.

Under these circumstances, the Survey and Manage Standards and Guidelines provide four criteria "indicating little or no concern for persistence" on the analysis unit:

(1) "[m]oderate-to-high number of likely extant sites/records";

(2) "[h]igh proportion of sites and habitat in reserve land allocations; or limited number of sites within reserves, but the proportion or amount of potential habitat within reserves is high and there is high probability that the habitat is occupied";

(3) "[s]ites are relatively well distributed within the species range"; and

(4) "[m]atrix Standards and Guidelines or other elements of the Northwest Forest Plan provide reasonable assurance of species persistence."

AR 2983, 13447, 14695.

The agency may use these criteria to designate red tree vole sites as non-high priority provided that it follows the required

steps[4] for all category C species with known habitat sites within the Project area.  AR 13447, 14695.  "Usually most of these criteria need to be met to indicate that concern for persistence does not exist."  AR 14695; see also AR 2983.  Beyond these criteria, the NFP does not specify what factors or evidence the BLM can or must rely on in making its decision.  See Lands Council, 537 F.3d at 992 (the court must defer to the agency "as to what evidence is, or is not, necessary to support" its conclusions).  The Management Recommendations do not apply to sites that are appropriately demarcated as non-high priority.  AR 2980.

Here, the BLM assessed the Project at the 5th field watershed scale, which corresponds to a geographic scale that ranges from 40,000 to 250,000 acres, and found that all four criteria were met.[5]  AR 675-79, 2983.

i.   First Criterion

A project site meets the first criterion for a non-high priority designation if the watershed has a "[m]oderate-to-high

---

[4] There are additional procedural requirements that the BLM must satisfy in order to designate a site as non-high priority, none of which are challenged here.  AR 13401, 13447; see generally Compl.; Pls.' Mem. in Supp. of Mot. Summ. J.; Pls.' Reply to Mot. Summ. J.

[5] In 2003, the BLM conducted a pilot program to identify a method for designating red tree vole sites as non-high priority, so it "could release some sites for project implementation more expeditiously."  BLM's Mem. in Supp. of Cross-Mot. Summ. J. 11 (citing AR 2062-91).  This pilot project applied only to sites "within the pilot area," which included a specified number of 5th field watersheds but not the Marys River Watershed.  AR 2056, 2064, 2071.  The BLM allowed the pilot project to lapse in 2004; it updated the guidance for determining non-high priority sites in 2006 and 2012.  AR 2056, 2059, 2980, 4760.

Page 17 - OPINION AND ORDER

number of likely extant sites/records." AR 14695. The BLM concluded that the Marys River Watershed likely contained a moderate-to-high number of extant red tree vole sites by relying on existing databases, the Forsman's 2004 survey ("Forsman Study"), public comments, evidence from the adjacent Upper Alsea Watershed, the relatively high percentage of suitable older forest habitat on federal lands, and other, incidental vole observations. See AR 676-77; see also AR 683 (map of the two watersheds), 1095 (comments and responses).

Plaintiffs assert that the BLM's conclusion was arbitrary and capricious because: (1) there are only ten recorded sites on the Project area; (2) the Forsman 2004 survey cannot be relied on to determine vole population health; (3) no basis exists for concluding that a relatively high percentage - i.e. 35% percent - of suitable older forest habitat is present within the Mary Rivers Watershed because "[t]he only document which provides guidance on the relativeness of these percentages is the pilot project," which determined that "watersheds contain[ing], on average, between 27 and 36 percent suitable older forest on federal land . . . were deemed not to have a relatively high percentage"; and (4) "data from the Upper Alsea Watershed has no relevance to the Rickard Creek sale or the four site designation criteria." Pls.' Mem. in Supp. of Mot. Summ. J. 16-19 (citations and emphasis omitted).

Initially, the ten recorded sites do not reflect the number of estimated vole sites, but rather the number of surveyed sites currently in the BLM's database. AR 676-77. Because the BLM

Page 18 - OPINION AND ORDER

"found that information insufficient to estimate the number of red tree vole sites[,] [it] supplemented that database data with other sources of relevant information and analyses to estimate the number of sites in the watershed." BLM's Mem. in Supp. of Cross-Mot. Summ. J. 17 (citing AR 676-77). As such, the BLM looked to other existing data regarding the incidence of active vole sites in the area.

Notably, the BLM relied on "other incidental vole detections" not yet recorded in the agency's database, which "show[ed] numerous vole locations." AR 676-77. The BLM also relied on the Forsman Study, which "examined the distribution and relative abundance of tree voles in different regions of Oregon based on their occurrence in diets of northern spotted owls," by dissecting the owls' regurgitated pellets in search of red tree vole "skeletal remains." AR 5377. This survey found that red "tree voles are widely distributed in western Oregon [and] [t]hey appear to be most common" in areas that include the Marys River Watershed. AR 5383; see also AR 5380 (map). Further, the record demonstrates that the BLM did not employ this study to "assess population trends" or to analyze vole distribution "at a larger, regional scale." Pls.' Mem. in Supp. of Mot. Summ. J. 15 (quoting AR 5383-84); Pls.' Reply to Mot. Summ. J. 4. Rather, the first criterion pertains to how many red tree voles currently exist in the watershed and "the BLM relied on the Forsman survey only for its evidence of current red tree vole prevalence [in Marys River Watershed], not whether the red tree vole population was increasing or declining." BLM's Mem.

Page 19 - OPINION AND ORDER

in Supp. of Cross-Mot. Summ. J. 18; see also AR 676 (Forsman Study found "relatively high proportions [of red tree voles] at the majority of spotted owl sites" south of Highway 20, within Marys River Watershed, indicating that "there are likely moderate to high numbers of extant vole sites").

Plaintiffs' contention that the Forsman Study is not useful "'to infer the occurrence of tree voles in areas where old forests have been largely eliminated by harvest,'" such as the Rickard Creek Project, is without merit.[6]   Pls.' Mem. in Supp. of Mot.

---

[6] Plaintiffs also argue, for the first time in their reply brief, that the BLM impermissibly relied on the Forsman Study because it is stale. See Pls.' Reply to Mot. Summ. J. 4 (citing The Lands Council v. Powell, 379 F.3d 738, 748-49 (9th Cir. 2004) (as amended)). In so arguing, plaintiffs identify several other studies, issued between 2002 and 2007, that allegedly undermine the conclusions of the Forsman Study. Id. (citing AR 3027, 4438, 6009). Plaintiffs, however, failed to assert this argument, either generally or via inference, during the National Environmental Policy Act ("NEPA") comment/protest period or in their opening brief; there is absolutely no indication in the record that plaintiffs previously asserted, either generally or via inference, the issue of staleness. See AR 51-53, 108-09, 1702, 1704-05, 1736-44, 1869-72, 1997-99. Thus, while plaintiffs are correct that arguments raised during the administrative process need not be raised in precise legal terms, they nonetheless "forfeited any objection to the EA on [this] ground." Pub. Citizen v. Dep't of Transp., 541 U.S. 752, 764-65 (2004); see also Lentini v. Cal. Ctr. for the Arts, Escondido, 370 F.3d 837, 843 n.6 (9th Cir. 2004) (courts ordinarily decline to consider arguments first raised in a reply brief). Even assuming, however, that this argument was properly raised, the evidence that plaintiffs cite to does not establish that the Forsman Study is outdated; in fact, more recent studies, including those that plaintiffs rely on, continue to employ the Forsman Study as valid data. See, e.g., AR 4436, 7760. In any event, these studies indicate that voles are not widely distributed in areas north of Highway 20, outside of the Marys River Watershed. See AR 3027, 4436-39. This information was recently confirmed by the FWS' 2011 survey, which the BLM expressly considered pursuant to their non-high priority designation analysis. See AR 676-79. Further, because the BLM relied on contemporary data in addition to the Forsman Study,

Summ. J. 15 (quoting AR 5384).  When read in context, the survey makes clear that this statement pertains to spotted owl habitat and the scope of the study:

> our data cannot be used . . . to assess the response of tree vole populations to different types of forest management.  Our data came entirely from areas occupied by spotted owls, which tend to include extensive area of old forest intermixed with young forest.  Thus, our data should not be used to infer the occurrence of tree voles in areas where old forest have been largely eliminated by harvest [because those areas typically do not contain spotted owls].

AR 5384.

In any event, the BLM did not use the Forsman Study to infer that voles are present in relatively younger stands like Rickard Creek; rather, the BLM employed this study, which contained explicit findings regarding the Central Coast range, to conclude that voles are present within the mature forest habitat in Marys River Watershed.  See AR 676-77 (employing the watershed scale to analyze the existence of active vole sites); see also AR 5380-84.  As such, the BLM reasonably concluded that this study was useful for inferring the likely occurrence of tree voles in the Marys

_____

Powell is inapposite.  See W. Watersheds v. U.S. Forest Serv., 2012 WL 1094356, *9 (N.D. Cal. Mar. 30, 2012); see also AR 676-77 (BLM relying on contemporary vole surveys performed in accordance with the "Survey Protocol for the Red Tree Vole").  Finally, the "Survey Protocol for the Red Tree Vole," which plaintiffs rely on in support of their argument that studies over five years old are invalid, is inapplicable because the Forsman Study was not completed pursuant to that protocol.  Compare AR 5377 (purpose of the Forsman Study was to evaluate "the distribution and relative abundance of tree voles in different regions of Oregon based on their occurrence in diets of northern spotted owls"), with AR 6003 (purpose of the "Survey Protocol for th Red Tree Vole" is to "is to provide a consistent approach for locating active red tree vole sites in proposed project areas within the species' known or suspected range and habitat conditions within the [NFP] area").

Page 21 - OPINION AND ORDER

River Watershed, which falls within the Central Coast range.    AR 676 (BLM relying on the Forsman Study, which indicated that "all 17 spotted owl sites within 10 miles of the Rickard Creek harvest unit had moderate to high incidence or red tree vole remains in the sampled pellets," to evaluate the first criterion); see also AR 390, 563.    This Court must therefore defer to the BLM's conclusions because "those conclusions are supported by studies that the agency deems reliable." Native Ecosys. Council v. Weldon, 697 F.3d 1043, 1053 (9th Cir. 2012) (citation and internal quotations omitted); see also Lands Council, 537 F.3d at 992.

Additionally, the BLM evaluated data from the adjoining Upper Alsea Watershed "for further evidence by which to extrapolate data for the Marys River watershed." BLM's Mem. in Supp. of Mot. Summ. J. 19 (citing AR 676-77).    In other words, the BLM used information from the Upper Alsea Watershed in conjunction with scientific data from the Marys River Watershed and current field observations, also specific to the Marys River Watershed, to extrapolate information regarding the likely number of existing vole sites in the relevant analysis unit.    Plaintiffs have not cited to, and the Court is not aware of, any authority indicating that this practice was unreasonable under the circumstances. See Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002) ("[o]rdinarily, an agency has the discretion to determine the physical scope used for measuring environmental impacts"). Thus, contrary to plaintiffs' assertion, the BLM did not disregard data from the Marys River Watershed in favor of information from the

Page 22 - OPINION AND ORDER

Upper Alsea Watershed.

The fact that Upper Alsea Watershed is in the Mesic Zone, whereas the Marys River Watershed is in the Northern Mesic Zone, does not invalidate the BLM's conclusions. These administrative units were created by the BLM and the Forest Service in order to allow for more efficient vole management due to the fact that they distributed unevenly across their range. AR 4436. While these zones generally pertain to certain geographical regions in Oregon - for instance, the Northern Mesic Biological Zone includes the North Coast and North Cascades ranges, and the Mesic Biological Zone encompasses the central Cascades and Coast Ranges - they have little intrinsic meaning. Id.; see also AR 682 (map), 10591-93 (maps). Accordingly, both researchers and the agencies refer these regions and their scope in slightly different terms. Compare AR 5381-84 (Forsman Study including Marys River Watershed in the Central Coast range), with AR 7761 (the FWS survey including Marys River Watershed in the North Coast range); see also AR 10590-91. Thus, as the BLM notes, "that administrative boundary has no functional effect on the red tree voles," especially in light of the fact that the Marys River Watershed and the Upper Alsea Watershed are immediately adjoining one another and share many of the same geographic characteristics. BLM's Mem. in Supp. of Cross-Mot. Summ. J. 19; see also AR 2983 (internal agency guidance documents counseling the BLM to consider the "originating administrative unit and adjacent units within the province or other logical analysis unit").

Page 23 - OPINION AND ORDER

Finally, plaintiffs' contention that Marys River Watershed does not contain a relatively high percentage of suitable older forest habitat misconstrues the record in two material respects. First, under the NFP, the BLM and the Forest Service seek to retain older forest habitat in areas where "federal forest lands are currently comprised of 15 percent or less" late successional forest habitat; the BLM found that 35% of the federal lands in the Marys River Watershed are in late successional old growth, which is relatively high compared to the 15% NFP standard. See AR 74, 676-77, 1087, 1100, 16663; see also BLM's Mem. in Supp. of Cross-Mot. Summ. J. 20 n.4. Second, the pilot project did not, in fact, conclude that watersheds containing 27% to 36% suitable habitat on federal land were not eligible for non-priority designation. Rather, the pilot project makes clear that the this finding pertained to the percentage of quality habitat on federal lands within reserve allocations. See AR 2079. As discussed in greater detail below, 98% of the suitable vole habitat in the Marys River Watershed falls within reserves.

In sum, the NFP incorporates a flexible standard for determining the number of extant vole sites. Critically, this standard does not require the BLM to actually demonstrate how many red tree vole sites exist in the Marys River Watershed. See AR 14695. Rather, the BLM need only reasonably determine that there are likely a moderate-to-high number of extant vole sites. That is precisely what occurred here. The BLM aggregated information from various sources - i.e. current observations of voles sites, as well

as scientific data and evidence of vole incidence from the adjoining watershed - to determine that the first criterion was fulfilled. The BLM's methodology was rational and therefore is entitled to deference. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 52 (1983) (an agency satisfies the APA by "explain[ing] the evidence which is available, and . . . offer[ing] a rational connection between the facts found and the choice made") (citation and internal quotations omitted). The BLM's determination as to the first criterion was therefore neither arbitrary nor capricious.

ii. Second Criterion

A project site meets the second criterion for a non-high priority site if the relevant 5th field watershed has either: (1) a "[h]igh proportion of sites and habitat in reserve land allocations"; or (2) a "limited number of sites within reserves, but the proportion or amount of potential habitat within reserves is high and there is high probability that the habitat is occupied." AR 14695. The BLM evaluated this criterion by taking the overall number of older forest stands that contained suitable red tree vole habitat on the federal lands within Marys River Watershed and calculating what percentage of that land fell within reserve allocations. AR 677. The BLM concluded that a high proportion, or 98%, of the qualifying habitat was located in reserve allocations. Id. The BLM determined further that these sites were occupied based on the Forsman Study and the existence of voles in younger stands that were adjacent to older ones. Id.

Page 25 - OPINION AND ORDER

Plaintiffs acknowledge "that the majority of . . . potentially suitable [vole] habitat is within reserve allocations." Pls.' Mem. in Supp. of Mot. Summ. J. 19.  Nonetheless, plaintiffs argue that the BLM's determination regarding criterion two was arbitrary and capricious because the "[t]he BLM failed to provide any reasonable evidence that this habitat is actually occupied by red tree voles," because "the BLM conducted no actual, physical investigation." Id. at 19-20.  Plaintiffs also contend that the BLM's determination is invalid because voles are not prevalent at high altitudes, such as on Marys Peak, where the majority of the quality vole habitat exists: "[the Forsman Study indicated that red] tree voles are generally restricted to lower elevation coniferous forests [and] the BLM found that most of these older stands exists within a large block of Forest Service land on the east slope of Marys Peak." Id. at 20 (citations omitted).

Plaintiffs' arguments are unpersuasive for three reasons. First, nothing in the NFP or administrative record requires an actual, physical investigation into whether red tree voles sites exist in the potentially suitable habitat in reserves or are actually occupied. See, e.g., Lands Council, 537 F.3d at 994 (overturning the "on-the-ground analysis" requirement and instead deferring to the agency when it "explain[ed] the conclusions it has drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable"); see also Pls.' Reply to Mot. Summ. J. 9 (conceding that "courts sometimes defer to the government's chosen methodology to establish occupancy").

Page 26 - OPINION AND ORDER

Plaintiffs cite to the "Survey Protocol for the Red Tree Vole" in support of the proposition that "on-the-ground surveys are the only accepted method of establishing vole occupancy." Pls.' Reply to Mot. Summ. J. 9 (citing AR 6009). However, the objective of this "protocol is to provide a consistent approach for locating active red tree vole sites within proposed project areas." AR 6003. As such, the BLM followed the survey protocol in identifying active red tree vole sites pursuant to the first criterion. See AR 677; see also AR 2169 ("[r]ed tree vole surveys were conducted to protocol on approximately 115 acres [within the Marys River Watershed]"). The second criterion, however, revolves around whether these previously identified active red tree vole sites and/or habitat within reserves are occupied. AR 14695; see also AR 7773 ("the presence of nests, even those classified as 'active,' do not necessarily equate to tree vole occupancy"). Thus, nothing in the "Survey Protocol for the Red Tree Vole" required the BLM to conduct on-the-ground surveys at this stage in its non-high priority analysis.

Second, while there is a multitude of evidence in the record regarding the elevations at which the incidence of voles diminish, lower elevation heights can include altitudes up to 4265 feet. AR 7760; see also AR 5381-83 (Forsman Study finding that "voles are uncommon at elevations above 1220m," or 4000 feet, but nonetheless noting that data and other evidence indicates that they are present in altitudes up to 4560 feet), 4439 (2007 Final Environmental Impact Statement indicating that voles are "usually are found at

elevations below about 3,600 feet"). Yet, the top of Marys Peak is only approximately 4000 feet. AR 836. Accordingly, it was not unreasonable for the BLM to conclude that late successional old growth forests on Marys Peak would provide suitable vole habitat.

Third, the Marys River Watershed encompasses 193,962 acres, 15,648 of which the United States owns. AR 677. Of those federal lands, 12,674 acres, or 81%, are in NFP reserve allocations.[7] Id. Of the approximately 5475 federal acres with late successional old growth forest conditions, which is the preferred habitat for red tree voles, 5,365 are in reserve allocations and 130 are designated as matrix lands available for regeneration. Id. As the BLM concluded, 98% "of the highest quality red tree vole habitat . . . is in reserve land allocations that are not subject to timber harvest." Id. The BLM's determination that a high proportion of red tree vole sites and habitat existed in reserve land allocations was therefore reasonable and well-supported by the record.

Even assuming that a limited number of vole sites fall within reserves, it is undisputed that the amount of potential vole habitat within reserves is high. Compare BLM's Reply to Cross-Mot.

---

[7] Plaintiffs contend, for the first time in their reply brief, that the BLM improperly considered both riparian reserves and late-successional reserves in calculating the proportion of reserve land in the Marys River Watershed. See Pls.' Reply to Mot. Summ. J. 7-8. Neither the NFP nor the agency's internal guidance documents specify which types of reserves can or should be considered in regard to this criterion. See AR 2983, 13447, 14695. As such, the BLM reasonably interpreted the second criterion as including all types of reserve land and that interpretation is due deference. See Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1098 (9th Cir. 2003) ("federal courts are required to defer to an agency's reasonable interpretation of its own guidelines").

Summ. J. 8 ("BLM concluded that the Marys River Watershed met the standards for both options, although satisfying either one is sufficient"), with AR 6 (BLM's response to plaintiff's administrative appeal, in which they acknowledge that "[t]here are limited number of sites within reserves in the watershed"); see also Pls.' Mem. in Supp. of Mot. Summ. J. 19. Furthermore, the BLM concluded that "existing suitable habitat is occupied" because the Forsman Study implicated "moderate to high percentages of red tree vole remains within all of the sampled spotted owl sites" and "voles [were observed] in young forest stands that lie adjacent to [late successional old growth] forest patches." AR 677. Specifically, "the BLM used the evidence of red tree voles in younger stands to show that they had out-populated the existing old growth stands and were overflowing into less-desirable, younger stands." BLM's Mem. in Supp. of Cross-Mot. Summ. J. 21-22 (citing AR 667, 7761); see also AR 7775 (in discussing the presence of red tree voles in younger stands, the FWS noted that "individuals may be driven into marginal habitat if it is all that is available"). While, as discussed above, plaintiffs attack this conclusion because the BLM failed to provide any affirmative proof that this habitat was actually occupied, the Court finds that the BLM's determination was nonetheless rationale and related to the evidence of record. Therefore, the BLM did not act arbitrarily or capriciously in determining that the second criterion was met.

    iii. Third Criterion

A project area meets the third criterion for non-high priority

designation if the species' "[s]ites are relatively well distributed within the species range." AR 14695. The BLM assessed this criterion at the watershed level. AR 677-78. In determining that it was met, the BLM relied primarily on the Forsman Study, the existing database of known vole sites within the Upper Alsea and Marys River Watersheds, and an internal agency guidance document. AR 678, 2983.

Plaintiffs argue that the BLM erred by ignoring the red tree vole range, in which "[t]he BLM concedes that voles are not widely distributed." Pls.' Reply to Mot. Summ. J. 11; see also Pls.' Mem. in Supp. of Mot. Summ. J. 16, 20 (citing AR 4040-41, AR 7771). Plaintiffs argument, however, ignores the agency guidance document that expressly directs the BLM to analyze species distribution at the watershed scale:

> Briefly document the following for the species: life history, ecology, number and distribution of known sites, condition of known sites in close proximity to the proposed non-high priority sites, and general habitat condition on the originating administrative unit and adjacent units within the province or other logical analysis unit that more appropriately addresses the species distribution (e.g. 5th field watershed). Describe the proposed non-high priority sites and explain how this proposal will comply with species persistence objectives and persistence criteria on the originating administrative unit and adjacent units within the province or other logical analysis unit that more appropriately addresses the species distribution.

AR 2983.

Here, the BLM did just that; it considered vole distribution within the Marys River Watershed and the adjoining Upper Alsea Watershed. See AR 677-78 (conceding that the FWS' 2011 survey indicated that "vole numbers and density of sightings taper off" on

Page 30 - OPINION AND ORDER

federal lands "farther north of this watershed," but nevertheless concluding that "[b]ased on the assessment of conditions within the Marys River watershed and adjacent federal lands, vole sites appear to be well distributed"); see also AR 564 (BLM finding that the Project area "lies in the . . . Central Oregon Coast Range" based on the Forsman Study and concluding that "[w]ithin the adjoining Upper Alsea and Marys River watersheds vole sites appear to be well distributed and show connectivity with areas of high vole density in the South Coast Range").

Further, as the BLM notes, "nothing requires the [NFP] to use the same analysis scales as the ESA in establishing a 'species range.'" BLM's Mem. in Supp. of Cross-Mot. Summ. J. 23. In fact, neither the NFP nor the 2001 ROD define "species range" in this context. Accordingly, the BLM was allowed to reasonably interpret the NFP and apply its own guidance documents in order to determine that the relevant "species range" was the watershed level. See Hells Canyon Alliance v. U.S. Forest Serv., 227 F.3d 1170, 1180 (9th Cir. 2000) (agency's interpretation of its "own regulations is controlling unless 'plainly erroneous or inconsistent with the regulation'") (quoting Auer v. Robbins, 519 U.S. 452, 461 (1997)); see also Idaho Sporting Cong., 305 F.3d at 973. Moreover, because evidence in the record supports the BLM's conclusion that red tree voles are widely distributed within the Marys River and Upper Alsea Watersheds, that conclusion is entitled to deference.[8] See, e.g.,

_____

[8] Even the FWS' 2011 survey, which plaintiffs rely heavily on, indicates that voles are more well-distributed within the proposed Project area. Regarding distribution, this study

AR 2020-21, 2169, 5381-84.

####     iv.  Fourth Criterion

A project site meets the fourth and final criterion for a non-high priority site if "Matrix Standards and Guidelines or other elements of the [NFP] provide reasonable assurance of species persistence." AR 14695.  The BLM concluded that this criterion was fulfilled because "[t]he recent 12-month finding on red tree voles determined that existing regulatory mechanisms are adequate to provide for the conservation of the red tree vole on Federal lands where they occur within the DPS."  AR 678.  Central to this determination was the fact that the BLM found "well distributed and interconnected reserved lands" within the Marys River watershed; 5,365 acres of older forest reserve allocations would allow for species persistence, while the 130 acres of matrix land in the Marys River watershed, including the Rickard Creek timber sale, would be "available for regeneration harvest" because they are unlikely to "contribute to vole persistence now or in the future." AR 678, 683-84.

---

concluded that red tree voles "continue to be widely distributed throughout much of their range in Oregon with the exception of the northern Oregon Coast Range, particularly the area within the DPS north of Highway 20."  AR 7771; see also Cascadia, 2012 WL 6738275 at *9.  In other words, "[i]n the northern Oregon Coast Range north of Highway 20, tree voles are now considered uncommon and sparsely distributed" because this area consists "primarily [of] State, County, and private [lands]," where habitat loss is especially acute.  AR 7771.  While the Marys River Watershed, and by extension the Rickard Creek Project, lie within the North Oregon Coast DPS, both are located south of Highway 20 in a stronghold of federal land where vole habitat and incidence are more abundant.  See AR 4440-41, 7767, 7781; see also AR 2020-21, 2169.

Plaintiffs argue that the BLM's finding was arbitrary and capricious because "[t]he vast majority of the Marys River Watershed is not federal forest land [such that it was] unreasonable to only rely upon federal forest lands to account for vole persistence over the entire watershed." Pls.' Mem. in Supp. of Mot. Summ. J. 23.  In addition, plaintiffs contend that the Rickard Creek Project will threaten the red tree vole species' persistence by eliminating almost "half of the estimated vole sites in the entire watershed [where] there is very little older forest left." Id. at 22-26. Lastly, plaintiffs' reassert their argument that "[a]ll sites on Federal land within the DPS are considered high priority." Id. at 22-23 (citing 7783).[9]

As discussed above, however, the FWS clarified that the language "used in the 12-month finding is in no way meant to change

---

[9] For the first time in their reply brief, plaintiffs argue that the BLM erred in concluding that leave trees would grow enough within 30 years for red tree voles to re-occupy that habitat, relying on BLM estimates indicating that the trees' quadratic mean diameter at breast height will reach only 13.9 inches after 50 years, and the "Red Tree Vole Survey Protocol," which counts stands as "suitable habitat that may contribute to reasonable assurance of persistence" only when they reach 16 inches. Pls.' Reply to Mot. Summ. J. 16. Plaintiffs, however, waived this argument by not raised it during the NEPA process or in their opening brief. See Pub. Citizen, 541 U.S. at 764-65; Lentini, 370 F.3d at 843; see also Pls.' Mem. in Supp. of Mot. Summ. J. 22-27; AR 54, 110, 1702, 1704-05, 1736-44, 1869-72, 1997-2000. Regardless, plaintiffs' argument is without merit because the survey protocol defines suitable habitat using a different metric. See AR 678. Notably, the BLM relied on several converging pieces of evidence in concluding that red tree voles would "re-establis[h] and dispers[e]" among the harvested portion of the Rickard Creek Project; it relied on the ten trees per acre left behind from the harvest, most of which already have diameters at breast height that exceed the 16 inches, as well as the proximity of adjacent lands from which red tree voles could reestablish and disperse. See AR 604, 678, 1595.

or override the FS and BLMs process for identifying [non-high priority] sites within the DPS." AR 2020-21. Accordingly, consistent with the NFP and the FWS' position statement, only those sites not designated, on a case-by-case basis, as non-high priority are critical for vole persistence.

Moreover, the ratio of federal land or late-successional forest to the watershed is irrelevant under the fourth criterion. This criterion instead focuses on whether existing regulations and the reserve system would provide reasonable assurance of species persistence. In this case, the BLM concluded that the reserve allocations protect almost all of the late-successional forest. AR 678. Likewise, the BLM resolved that losses of individual voles would not jeopardize the entire species. See AR 38 (BLM "anticipate[d] the loss of individual red tree vole nests as result of harvest activities but [did] not expect the project to have an appreciable effect on the population of red tree voles in this watershed since voles are well-distributed throughout"). Plaintiffs have not provided any argument or evidence indicating that the forfeiture of "those individuals would be significant for the species as a whole." Pac. Coast Fed'n of Fisherman's Ass'ns v. Gutierrez, 606 F.Supp.2d 1195, 1210 n.12 (E.D. Cal. 2008). This Court must defer to the BLM's determination where, as here, that determination is rational and supported by evidence of record. See, e.g., Envtl. Prot. Info. Ctr. v. Forest Serv., 451 F.3d 1005, 1010-11 (9th Cir. 2006) ("[i]t was not arbitrary and capricious for [the agency] to determine that although there will be some effect

on individuals pairs, this will not cause a significant adverse effect on the species"); see also Lands Council, 537 F.3d at 992.

Further, the Rickard Creek Project will treat only 92 acres of 80-year old stands in the matrix with regeneration harvest. That method will leave approximately 180 large diameter, late-successional old growth, green trees among the approximately 900 total leave trees; accordingly, the majority of old growth trees, the preferred vole habitat, are reserved from harvest within the regeneration harvest unit. AR 604, 678, 1604. In other words, approximately ten per acre will remain to assist red tree voles redistribution. Additionally, after the planned harvest of the Rickard Creek timber sale, there would be 31 acres remaining as suitable habitat for red tree voles outside of harvest unit and 350 acres of unsurveyed late-successional old growth stands that are likely occupied. See AR 565, 678-79, 681 (map evincing that the 31 acres of occupied habitat are adjacent to the Rickard Creek Project), 684 (map showing that the 350 acres of reserves in are plainly adjacent to the red Rickard Creek Project), 7760. Therefore, as the BLM concluded, "it is reasonable to expect the re-establishment and dispersal of red tree voles in the harvested portion of the Rickard Creek timber sale within 30 years following harvest" due to the number of leave trees, the proximity to 31 acres of occupied habitat, and the presence of 350 acres of adjacent unsurveyed late-successional old growth forest. AR 23, 678, 681, 684.

The foregoing discussion reveals that the BLM provided a

reasonably thorough analysis, which was adequately supported by materials in the administrative record, of the four critical aspects of non-high priority site designation within the proposed Project area. Even assuming, however, that one or two of the requisite four criteria were not met, the BLM's decision would not necessarily be impermissible. See AR 14695 ("[u]sually most of these criteria need to be met to indicate that concern for persistence does not exist"); see also AR 2983. Thus, while this Court may have reached a different conclusion based on the same evidence, because it may not substitute its judgment for that of the BLM, the agency's decision must be upheld. Based on the record before the Court, the BLM reasonably determined that the Rickard Creek Project was a non-high priority vole site under the NFP. Accordingly, the BLM's and Seneca's motions are granted as to this claim; plaintiffs' motion is denied.

B. <u>Contribution to the Need to List the Red Tree Vole Under the Endangered Species Act</u>

In addition to directing agencies to develop RMPs that govern all uses and management of its public lands, the FLPMA requires the BLM to ensure that site-specific actions are consistent with and conform to the governing RMP. See 43 U.S.C. §§ 1712, 1732(a); 43 C.F.R. § 1601.0-5(b) & (c). Relevant here, the Salem RMP requires the BLM to "[m]anage for the conservation of federal candidate and bureau sensitive species and their habitats," and directs the BLM to "[m]odify, relocate, or abandon a proposed action to avoid contributing to the need to list federal candidate species, state-

listed species, bureau sensitive species, or their habitats." AR
15560-61; <u>Cascadia Wildlands v. Bureau of Land Mgmt.</u>, 2013 WL
1900632, *3 (D. Or. May 4, 2013) ("the contribution language asks
whether a project would lead a species to be listed"); <u>see also</u> AR
7914 (the red tree vole is both a federal candidate species and a
bureau sensitive species). The BLM found that, because voles were
"more abundant and well distributed than other areas farther north
in the Oregon Coast Range . . . the activities associated with this
project will [not] contribute to a need to list the species." AR
125.

Plaintiffs argue that the BLM's determination was erroneous
because "voles are not abundant or well-distributed in Oregon's
North Coast Range, and the project area is within the northern most
biological zone for the red tree vole, the Northern Mesic Zone,
[such that] the BLM's statement about areas farther north does not
make any sense or have any bearing on this 'contribution'
standard." Pls.' Mem. in Supp. of Mot. Summ. J. 27-28. Plaintiffs
also argue that the BLM's conclusion that the Project's "'short
term impacts' to the vole would be outweighed by the 'long term
benefits'" was arbitrary and capricious because the "long term
benefits to voles are never mentioned in any of the planning
documents surrounding the project" and regeneration harvests do
"not provide any benefit to the species, but instead will result in
the loss of nest trees and degradation of 85 acres of occupied
habitat and the conversion of the project area from late-seral to
early-seral." <u>Id.</u> at 28 (citing Answer ¶ 24; AR 383, 655).

Finally, plaintiffs challenge the BLM's decision on the basis that it "did not apply the normal contribution criteria to red tree voles that it applied to every other sensitive species in the project area." Id. (citing AR 125, 650; Klamath Siskiyou Wildlands Ctr., 2004 WL 1289536, *1 (D. Or. June 9, 2004)).

As a preliminary matter, the BLM did not conclude that the short term impacts on the vole were outweighed by the longer term impacts to that species; instead, the BLM found that "short term impacts are outweighed by the long term benefits associated with the project," which are, in fact, discussed within the planning documents. AR 125. Furthermore, non-high priority sites "indicat[e] little to no concern for persistence of the species at the [watershed] scale." AR 13447. Thus, as the BLM notes, "[i]f a project would not affect a species' persistence in a relatively small geographic area, the fifth field watershed level, then a fortiorari, the project would not affect the species' persistence across its entire range." BLM's Mem. in Supp. of Cross-Mot. Summ. J. 27 (emphasis removed). Put another way, the fact that BLM properly designated the Rickard Creek Project as a non-high priority site for vole persistence indicates that the proposed action will not contribute to the need to list the species under the ESA; as discussed above, voles are well distributed generally within their species range in Oregon, as well as in areas south of Highway 20, including the Marys River and Upper Alsea Watersheds. See, e.g., AR 2169, 5383-84, 7771.

Moreover, nothing in the record requires the BLM to use the

contribution criteria that plaintiffs identify for the red tree vole. See AR 650. Rather, the BLM can establish that a project would not contribute to the need to list a species using another method. See, e.g., Utah Shared Access Alliance v. U.S. Forest Serv., 288 F.3d 1205, 1212 (10th Cir. 2002) (failure to employ a particular method of analysis does not render an EA inadequate) (citation and internal quotations omitted). Here, the BLM chose to generally rely on the same information in its "Biological Assessment" as in the "Proposal for Non-High Priority Site Status for Red Tree voles in the Rickard Creek Project Area" and, based on that information, determined that "this project will [not] contribute to the need to list" the species. AR 125; compare AR 650-51, with AR 675-79. A review of the record persuades the Court that the BLM gave proper consideration to all relevant aspects in so deciding. As such, the Court cannot conclude that this methodology was unreasonable under the circumstances.

Plaintiffs' reliance on Klamath is also misplaced. Essentially, plaintiffs assert that, because Klamath held that the BLM satisfied its "obligation to manage lands so as not to contribute to the need to list the species" when it followed the applicable Management Recommendations, the BLM's failure to follow any Management Recommendations here implicates that the Project will contribute to the need to list the vole. Klamath, 2004 WL 1289536 at *1; see also Pls.' Mem. in Supp. of Mot. Summ. J. 30-31. Yet nothing in the record requires the BLM to use the Management Recommendations to establish that a project will not contribute to

Page 39 - OPINION AND ORDER

the need to list a species; indeed, following the Management Recommendations is not mandated where, as here, a project is properly categorized as a non-high priority site.  AR 13447; see also Crouse-Hinds Co. v. InterNorth, Inc., 634 F.2d 690, 702-03 n.20 (2d Cir. 1980) ("[t]he proposition that 'A implies B' is not the equivalent of 'non-A implies non-B,' and neither proposition follows logically from the other") (citations omitted).  As such, the BLM did not act arbitrarily or capriciously in determining that the Rickard Creek Project would not contribute to the need to list the vole under the ESA.  Therefore, the BLM's and Seneca's motions are granted as to this claim; plaintiffs' motion is denied.

III. Remaining Issues

Because the BLM did not violate the FLPMA in designating the Rickard Creek Project area as a non-priority site, the Court need not address Seneca's arguments regarding the O&C Act.  Nonetheless, the Court notes briefly that, while this area of law is far from settled, the O&C Act generally does not excuse the BLM from complying with its statutory conservation duties.  See Seattle Audubon Soc'y v. Lyons, 871 F. Supp. 1291, 1313-15 (W.D. Wash. 1994), aff'd, 80 F.3d 1401 (9th Cir. 1996) (distinguishing Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1183 (9th Cir. 1990), to conclude that "in managing the [O&C Act] lands the BLM must fulfill conservation duties imposed by other statutes [such as] NEPA or ESA [and it does not] prevent injunctive relief when those duties have been breached") (citations omitted).

Additionally, because of this Court's disposition of the

parties' summary judgment motions, plaintiffs' request for a temporary and/or permanent injunction is denied as moot. In other words, because plaintiffs' failed to establish a violation of the FLMPA, equitable relief is not proper. See Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2758-59 (2010). Lastly, plaintiffs' motion to strike the declaration of D. Scott Hopkins, which pertains to injunctive relief, is also denied as moot, as the Court did not consider on this evidence in deciding the parties' summary judgment motions or plaintiffs' entitlement to equitable relief. See Perez-Denison v. Kaiser Found. Health Plan of the N.W., 868 F.Supp.2d 1065, 1088-89 (D. Or. 2012).

### CONCLUSION

Plaintiffs' motion for summary judgment (doc. 37) is DENIED. Plaintiffs' motion to strike (doc. 41) is also DENIED. The BLM's and Seneca's cross-motions for summary judgment (docs. 40, 43) are GRANTED. As such, the parties' requests for oral argument are DENIED as unnecessary. This case is DISMISSED.

IT IS SO ORDERED.

Dated this /8th of October 2013.

_____
Ann Aiken
United States District Judge